UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| JEREMY GREEN | § § § | |
| **Plaintiff** | § § § | |
| Vs. | § § § | |
| SCHUTT ATHLETIC SALES COMPANY, SCHUTT SPORTS MANUFACTURING COMPANY, SCHUTT DESIGN GROUP, INC. SCHUTT SPORTS DISTRIBUTION COMPANY AND SCHUTT MANUFACTURING COMPANY | § § § § § § § § § | CIVIL ACTION NO. 5:05-CV-0164-C |
| **Defendants** | § | |

## SCHUTT ATHLETIC SALES COMPANY AND SCHUTT SPORTS MANUFACTURING COMPANY'S BRIEF IN SUPPORT OF MOTION TO EXCLUDE THE PROFFERED TESTIMONY OF BRADLEY EWING, PhD

> RICHARD E. HARRISON
> State Bar No. 09119500
> HARRISON & HULL, L.L.P.
> 1600 Redbud Blvd., Suite 300
> McKinney, Texas 75069
> (214) 585-0094
> (214) 585-0097 (facsimile)
> ATTORNEY FOR DEFENDANT
> SCHUTT ATHLETIC SALES
> COMPANY
>
> PHILLIP M. DAVIS
> DAVIS, WHITE & SULLIVAN, LLC
> One Longfellow Place
> Suite 3609
> Boston, Massachusetts 02114
> (617) 720-4060
> (617) 720-4055 (facsimile)
> ATTORNEY FOR DEFENDANT
> SCHUTT SPORTS MANUFACTURING
> COMPANY

**TABLE OF CONTENTS**

I. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 4

II. Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 5

III. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 6

    1.   The techniques underlying the proffered expert testimony must be reliable . . . . . . . . p. 7

    2.   Proffered Testimony Must be Relevant to be Admissible. . . . . . . . . . . . . . . . . . . . .  p. 8

IV. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 9

    1.   Dr. Ewing's main assumptions concerning residual earning capacity
        are not based on any facts, statistics, or analysis . . . . . . . . . . . . . . . . . . . . . . . . . p. 9

    2.   The methodology and techniques underlying Dr. Ewing's opinions
        lack sufficient reliability under the law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.11

        i.    Unreliability of Dr. Ewing's Opinions Concerning Loss of Earning . .  p. 11
            Capacity

        ii.   Unreliability of Dr. Ewing's Opinions Concerning Loss of Household   p. 12
            Services.

        iii.  Unreliability of Dr. Ewing's Opinions Concerning Present . . . . . . . . p. 13
            Value of Life Care Costs

V. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 14

## TABLE OF AUTHORITIES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) . . . . . . . .   p. 6, 7, 8

Federal Rule of Evidence 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 6

*General Electric, Co. v. Joiner*, 552 U.S. 136, 118 S.Ct. 512 (1997) . . . . . . . . . . . .  p. 8

*Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . p. 7

*Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . p.8

**TO THE HONORABLE JUDGE OF SAID COURT:**

COME NOW, Defendants Schutt Athletic Sales Company and Schutt Sports Manufacturing Company (hereinafter collectively referred to as "Defendants") and pursuant to applicable law, make and file their <u>Brief in Support of Motion to Exclude the Proffered Testimony of Bradley Ewing, PhD</u> and would respectfully show the Court as follows:

## I.
## BACKGROUND

Plaintiff Jeremy Green received a spinal cord injury during a football game while attempting to tackle another player. Mr. Green is an "incomplete" quadriplegic (Appendix, p. 53) and has functionality. He does volunteer work at the Heritage Oaks Nursing Home (Appendix, p. 44). Plaintiff's proffered vocational expert, Dr. Willingham, does not question Mr. Green's abilities to get into higher education. (Appendix, p. 45) Mr. Green lives alone. (Appendix, p. 58) He is going to school and intends to go to a local college. (Appendix, p. 59-61) He does not need assistance with breathing. (Appendix, p. 46, 47) He can move his head up and down; left and right. (Appendix, p. 48) He can move his shoulders, bend and straighten his arms at the elbows and bend his wrists up and down. (*Id.*) He has bed mobility. He is able to eat independently, shave with an electric shaver, use a toothbrush, push a non-motorized wheelchair or operate a motorized wheelchair. (Appendix, p. 49) He is capable of driving a vehicle that has been appropriately modified. (Appendix, p. 48, 49) As far as recreational activities, he has the capacity to do adaptive snow-skiing; adaptive fishing; sail a boat; be a Ham radio operator; operate model boats and cars; play adaptive table games; and operate a computer. (Appendix, p. 50, 51) However, as is stated *infra*, Plaintiff's proffered expert, Bradley Ewing, PhD, has assumed, among other things, that Mr. Green is unable to enter the work force.

Plaintiff designated Dr. Ewing as his forensic economist to testify concerning alleged economic damages, specifically lost earning capacity, replacement costs for "household services and production" and medical costs. Dr. Ewing's report is attached hereto. (See

Appendix, pp. 62-75)  To summarize his opinions, Dr. Ewing concluded that the current value of economic damages associated with Jeremy Green's loss of earning capacity and household services -- assuming that he would have only obtained a high school diploma without his injury -- would be $917,062 and $170,736 respectively; the current value of his loss of earning capacity and household services -- assuming he would have received a college degree without his injury -- would be $1,479,260 and $144,408 respectively; and the current value of his life care costs, including, but not limited to future medical care, would be between $5,781,648 and $6,879,507.  According to his report, Dr. Ewing places the total loss to Plaintiff in a range from $6,869,446 to $8,503,175.

## II.
## SUMMARY OF ARGUMENT

Defendants submit that Dr. Ewing's proffered opinions are inadmissible as expert testimony under applicable law.  He does not know whether the statistics upon which he bases his opinions are viable.  Although economics, by its nature, employs an analytical approach to statistical data, key assumptions upon which the opinions of Dr. Ewing rely are totally unsupported by any statistical data.  Key among these baseless assumptions is that Mr. Green will never enter the work force or generate any income stream.  Additionally, while Dr. Ewing assumes that without the subject injury, Mr. Green would have graduated from high school and/or college, he does not know the relevant statistics associated with such assumptions.  In addition, Dr. Ewing proffers results of economic calculations regarding the present value of projected medical expenses, but he refuses to share those calculations with Defendants because he claims that they are performed with proprietary software developed by him.  Because he refuses to reveal such calculations as a testifying expert, Plaintiff cannot proffer his expert opinions based on those calculations.

### III.
### APPLICABLE LAW

Dr. Ewing's proffered opinions, to be admissible as expert testimony at trial, must satisfy threshold requirements. His opinions on lost earning capacity, replacement costs for household services, and medical costs must be relevant and reliable. As the proffering party, Plaintiff bears the burden to demonstrate Dr. Ewing's opinions meet these criteria.

The U.S. Supreme Court set out the requirements for expert testimony to be admissible at trial under Rule 702 of the Federal Rules of Evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595-599 (1993). The *Daubert* standard in conjunction with Rule 702 requires the following regarding expert testimony for it to be admissible:

1. The testimony must pertain to "scientific, technical or other specialized knowledge," and
2. The testimony must "assist the trier of fact to understand the evidence or to determine the fact in issue."

*See Daubert*, 509 U.S. 589-91.

The Court must be the gate keeper to ensure that such testimony satisfies these requirements before ruled admissible. *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167 (1999). The *Daubert* requirements for the admissibility of proffered expert testimony apply to "scientific," "technical," or "other specialized" areas. *Id.* at 147-148.

1. The techniques underlying the proffered expert testimony must be reliable.

The crux of the *Daubert* requirements deals with the evidentiary reliability of a proffered expert's opinions. 509 U.S. at 590. In *Daubert*, the U.S. Supreme Court set out non-exclusive factors for the Court to consider in exercising its gate-keeping duties, which are:

a. whether the theory or technique can be and has been tested;

b. whether the technique relies upon the subjective interpretation of the proffered expert;
c. whether the theory or technique asserted has been subjected to peer review and publication;
d. whether and to what extent the technique or theory has a known or potential rate of error;
e. whether the theory or technique is generally accepted as valid by the relevant scientific community; and
f. whether there are non-judicial uses which have been made of the theory or technique. *Id.*

The Court must assess whether the reasoning or methodology beneath the opinions is scientifically valid. *Daubert*, 509 U.S. at 591-593; *Kumho Tire Co., Ltd.*, 526 U.S. at 153. Therefore, the court is to focus on the methodology used by the proffered expert, and not the conclusions they generate. *Daubert*, 509 U.S. 595. In making a determination concerning the reliability of the methodology, it is the research, analysis, and calculations that the proffered expert conducted in order to reach his opinions that the Court is to examine in making a *Daubert* determination of reliability. It is not to consider the plausibility, reasonableness, appeal or popularity of the opinions. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276-77 (5th Cir. 1998) (holding an expert's assurances that he has utilized generally accepted scientific methodology is insufficient; also, the proponent of an expert need not prove to the judge that the expert's testimony is correct, but must prove by a preponderance of the evidence that the testimony is reliable.)

    2.    Proffered Testimony Must be Relevant to be Admissible.

The *Daubert* standard of relevance requires proffered expert opinions to be sufficiently tied to the facts of the case so that the opinions will help the jury in determining the issues before it. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591. The studies, data, and other information upon which the proffered expert relies must closely fit the facts of the case. *Moore v. Ashland Chemical, Inc.*, 151 F.3d at 276-77 (holding that where causal relationship between Plaintiff's exposure to industrial chemicals and pulmonary illness was the issue, Plaintiff's proposed expert physician's testimony was property excluded because physician had insufficient information regarding underlying facts for the opinion to satisfy

*Daubert* requirement of relevance); *General Electric, Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512 (1997) (reversed and remanded based on finding that District Court did not abuse its discretion in excluding expert testimony based on epidemiological studies, where the studies upon which the Plaintiff's expert relied did not support his conclusions that Plaintiff's exposure to chemical agent contributed to his cancer).

## IV.
## ARGUMENT

1. Dr. Ewing's assumptions concerning residual earning capacity are not based on any facts, statistics, or analysis. His methodology is non-existent.

The main basis for Dr. Ewing's opinions concerning Mr. Green's loss of earning capacity and household services is the assumption that he will never enter the work force—that Mr. Green has no residual earning capacity. (*See* Appendix, p. 62-75) This lynch pin assumption neither is the result of any statistical analysis nor any evaluation of Mr. Green's functional capacity. Rather and incredibly, the foundation of his opinions regarding loss of earning capacity teeters on a brief conversation with the paralegal in the office of Plaintiff's counsel. According to the economist, the paralegal indicated that Mr. Green will not work in the future, although Dr. Ewing did not ask the paralegal the basis for this conclusion. (Appendix, p. 14, 15, 16, 17)

Dr. Ewing's assumption of no residual earning capacity is belied by the facts of the case. Dr. Willingham, the Plaintiff's own proffered vocational expert, states in his deposition that with reasonable accommodation, Mr. Green has the capacity to work. (Appendix, p. 52, 53) Dr. Willingham also testifies that those with a spinal cord injury at a younger age, like Mr. Green, are more likely to be employed. (Appendix, p. 54)

He has done nothing to evaluate Mr. Green's capacities, (Appendix, p. 25) He did not rely on Jeremy Green's deposition or Louise Green's deposition with regard to his functional capacity. (Appendix, p. 7, 8) He did not rely on any school records other than, perhaps, to confirm that Jeremy Green was in school at some point. (Appendix, p. 2)

When asked whether his conclusions concerning lost earnings would be wrong if it

were determined that Mr. Green will have residual earning capacity, Dr. Ewing denied the obvious for some time. However, he did finally admit that if the assumption of no residual earning capacity is changed, the total earning capacity lost figure will likely be changed. (Appendix, p. 36-42) The reality is that Jeremy Green does have a residual earning capacity and therefore, Dr. Ewing's calculations in that regard are meaningless.

Although he acknowledges that educational and earning history of family members has some predictive value, Dr. Ewing had only vague knowledge of Jeremy Green's family educational history and no knowledge of the family's earning history. (Appendix, p. 10 11) Because he did not investigate Mr. Green's school records other than for the limited purpose mentioned above, he obviously did not take into account Mr. Green's prior school performance. Similarly, Dr. Ewing has created two models for the projection of what Mr. Green might have earned had he graduated either from high school or college had he not been injured. While these models are based on the projected average earnings of high school and college graduates, Dr. Ewing has not made these models relevant to this case.

In other words, he did not perform any analysis as to the likelihood that Mr. Green would have graduated from high school or college. He did not consider the drop rate from Levelland High School or the percentage of males that graduate. While the average earnings for individuals who did not graduate from high school could have been presented, Dr. Ewing without any meaningful analysis chose not to present such a model. Likewise, his college model did not consider the percentage of males high school graduate entering, much less graduating from, college. (Appendix, p. 29) Consequently, his analysis of Jeremy Green's earning capacity, without the injury, has no relevant foundation.

Dr. Ewing could point to no peer-reviewed discussion of forensic economics, which approves the methodology of making assumptions without any analytical data or support. (Appendix, p. 18, 19) Basing opinions on economic assumptions with no relevance to the case is certainly not approved methodology for an economist. Dr. Ewing's assumptions are not based upon any statistic, data or other reliable foundation that is acceptable in the field

of economics. The assumptions are just that—assumptions — based on nothing of any pertinence to this case. As such, Dr. Ewing's opinions are not relevant, nor are they reliable and therefore, do not pass the *Daubert* challenge.

    2.    The Methodology and Techniques Underlying Dr. Ewing's Opinions Lack Sufficient Reliability Under the Law.

    *i.  Unreliability of Dr. Ewing's Opinions Concerning Loss of Earning Capacity*

Dr. Ewing assumed that, without the injury, Mr. Green would have graduated from high school in one model and that he would have graduated from college in the other. (Appendix, p. 28, 29) However, he did not know the dropout rates from Levelland High School—the high school Mr. Green attended prior to the injury. Moreover, he did no statistical analysis to support the assumption that without the injury Mr. Green would have graduated high school or college. (Appendix, p. 28, 29) He assumed that every year Mr. Green would have been in the workforce, but for the injury, he would have had fringe benefits, although he admits that many people who earn income in the US do not have the type of fringe benefits he imputed to Jeremy Green. (Appendix, p. 29, 30)

Dr. Ewing admits that his income figures for high school graduates are based on statistics, as are the figures for a college graduate, but he did not go to any source to find statistical information concerning the employability of individuals with lower level cervical spine injuries. (Appendix, p. 16, 21) In particular, he did not go to the National Spinal Cord Injury Statistical Center ("the Model") to determine the occupational status and opportunities for those with spinal cord injuries. (Appendix, p. 26, 27) Even Plaintiff's proffered vocational experts Dr. Willingham and Mr. Bagwell rely upon the Model (albeit to reach erroneous conclusions) (Appendix, p. 55, 56) Statistics from the Model report an employment rate of 41.5% for quadriplegics (Appendix, p. 77, 90-93) They also indicate that of persons who are younger when they receive a spinal cord injury are more likely to enter the workforce. (Appendix, p. 95) Yet, Dr. Ewing does not know what the Model system is or whether it is reliable. (Appendix, p. 20, 23) He indicated that Plaintiff's

vocational experts relied on the Model system and that he is relying on their reliance. (Appendix, p. 24)

Instead of using accepted methods of economics—analysis of reliable statistical data, Dr. Ewing has opted for no methodology. It appears that he is simply "crunching" numbers without accurate or reliable foundation. Such "analysis" is not of the nature which meets the *Daubert* standard.

    ii.    *Unreliability of Dr. Ewing's Opinions Concerning Loss of Household Services.*

Dr. Ewing used four to five year old data to support his opinion regarding the average number of hours that a person utilizes in a week for household services although he believes newer information was available which he did not choose to purchase. (Appendix, p. 31, 32) He was extremely reluctant to admit that if the average number of hours expended per week were lower in the new data, the present value of such services would also be lower (Appendix, p. 32, 33) He finally did admit this very logical point, however. (Appendix, p. 33)

Dr. Ewing provided an economic value for the Life Care Plan prepared by Plaintiff's proffered experts Willingham and Bagwell. However, Dr. Ewing did not know whether the "Other Essential Services" included in the Willingham/Bagwell Life Care Plan included items that he accounted for in his "Household Services"—such as an amount of money to pay a housekeeper, plumber, painter, etc. (Appendix, p. 33, 35) He admitted that he could not say how much of an overlap existed between household services he calculated and "other services" he valued for the Life Care Plan.

Dr. Ewing did not check to determine the most accurate data concerning household services to make sure that his opinions were accurate in that regard. He did not take the time to ensure that his estimates for household services did not overlap with the numbers he proposed for the life care plan so that Defendants would not be asked to pay twice for the same items. This lack of care and lack of attention illustrates the lack of reliability of Dr.

Ewing's opinions.

### iii. Unreliability of Dr. Ewing's Opinions Concerning Present Value of Life Care Costs

As part of his work as a proffered expert in this case, Dr. Ewing was tasked with taking the proposed future medical costs for Mr. Green which Plaintiff's proffered vocational experts have opined to be necessary and reducing such costs to their present value. Dr. Ewing testified that all of his calculations regarding his analysis of the growth rates for the items listed in his life care plan were made using his "proprietary software package." (Appendix, p. 3, 4, 5, 6) Because Dr. Ewing takes the position that the software is proprietary, he has refused to reveal his calculations used to arrive at the figures he presents. (*Id.*) This position and refusal to be transparent with his calculations deprives Defendants and this Court of the ability to analyze the reliability of such calculations. Therefore, Dr. Ewing's opinions based upon the hidden calculations must be stricken.

## V.
## CONCLUSION

Dr. Ewing's proffered opinions are not based on accepted methodology for an economist. The assumptions woven into those opinions have no relevant statistical basis. Further, such opinions do not account for Jeremy Green's situation and, therefore, are not relevant to this case. With regard to his use of calculations that he refuses to reveal, Plaintiff cannot utilize any opinions or numbers derived from the use of such calculations. As Dr. Ewing's opinions do not meet the *Daubert* test, they must be excluded from being presented in this case.

**WHEREFORE, PREMISES CONSIDERED,** Defendants, Schutt Athletic Sales Company and Schutt Sports Manufacturing Company request that the Court enter an order striking Dr. Ewing's opinions and prohibiting Dr. Ewing from offering or attempting to offer expert testimony with respect to them, and for such other and further relief, both at law and in equity, to which these Defendants may be justly entitled.

Respectfully Submitted,

HARRISON & HULL, L.L.P.
1600 Redbud Blvd., Suite 300
McKinney, Texas 75069
(214) 585-0094
(214) 585-0097 (facsimile)

BY:     /s/  Richard E. Harrison
        **RICHARD E. HARRISON**
        **State Bar No. 09119500**

        **COUNSEL FOR DEFENDANT SCHUTT ATHLETIC SALES COMPANY**

DAVIS, WHITE & SULLIVAN, LLC
One Longfellow Place
Suite 3609
Boston, Massachusetts 02114
(617) 720-4060
(617) 720-4055 (facsimile)

BY:     /s/  Phillip M. Davis
        **PHILLIP M. DAVIS**

        **COUNSEL FOR DEFENDANT SCHUTT SPORTS MANUFACTURING COMPANY**

## CERTIFICATE OF CONFERENCE

Defendants' Motion is opposed. Counsel for Plaintiff, and Richard E. Harrison, Counsel for Defendants, held a conference to discuss Defendants' Motion on July 17, 2006. Counsel for Plaintiff did not agree to the provisions of Defendant's Motion because it would exclude the testimony of Plaintiff's expert. Accordingly, the Motion is presented to the Court for a determination.

 /s/ Richard E. Harrison

**RICHARD E. HARRISON**

## CERTIFICATE OF SERVICE

   I hereby certify that a true and correct copy of the foregoing documents was filed by ECF, in accordance with the order of this Court, and served on the following counsel of record on July 17, 2006 by ECF notice.

Tommy J. Turner
TURNER & JORDAN, P.C.
P.O. Box 10104
Lubbock, Texas 79408-0104

Larry E. Coben
Katrina Jewett
COBEN & ASSOCIATES
8710 E. Vista Bonita Drive
Scottsdale, Arizona 85255

Doug Gwyther
OWEN & ASSOCIATES
500 North Water Street
8th Floor
Corpus Christi, Texas 78471-0001

G. Douglas Welch
JONES, FLYGARE, BROWN & WHARTON
1600 Civic Center Plaza
P.O. Box 2426
Lubbock, Texas  79408

Phillip M. Davis
DAVIS, WHITE & SULLIVAN, LLC
One Longfellow Place
Suite 3609
Boston, Massachusetts 02114

Andy Scharf
The Scharf Firm
606 North State Street
Litchfield, Illinois 62056


                 /s/ Richard E. Harrison
                **RICHARD E. HARRISON**